# United States Court of Appeals
## For the First Circuit

No. 25-1732

JOHN BUCCIERI,

Plaintiff, Appellant,

v.

BREWSTER AMBULANCE SERVICE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

Before

Dunlap, Lynch, and Kayatta,
Circuit Judges.

Andrew Rozynski and Eisenberg & Baum, LLP for appellant.
Sarah B. Herlihy and Herlihy Law LLC for appellee.

July 13, 2026

**LYNCH**, **Circuit Judge**.    In this Americans with Disabilities Act ("ADA") case, appellant John Buccieri appeals from the district court's grant of a Federal Rule of Civil Procedure 50(b) motion filed by Brewster Ambulance Service, Inc. ("Brewster") and entry of judgment as a matter of law ("JMOL") following the liability phase of a jury trial.  Buccieri v. Brewster Ambulance Serv., Inc., 792 F. Supp. 3d 273, 283 (D. Mass. 2025).  The jury had returned a verdict for Brewster on Buccieri's claim of failure to hire for a Chair Car Driver position, finding that Brewster had "prove[d] by a preponderance of the evidence that providing Mr. Buccieri with the requested accommodation(s) would have been an undue hardship to Brewster Ambulance and/or posed a direct threat to Mr. Buccieri or others."  The district court held on the evidence presented no reasonable jury could conclude that Brewster had failed to engage in an interactive process as required by the ADA.  Id. at 282-83.

On de novo review, we affirm the district court's entry of JMOL.  We hold that no reasonable jury could conclude that there was a reasonable accommodation that would have allowed Buccieri to perform the essential communications functions of the driver positions without undue hardship to Brewster.

## I.

We describe the facts of record that were not materially disputed, largely documented in contemporaneous writings or testimony from the trial.

## A.

Brewster is a family-owned medical transportation services company. Collectively, Mark Brewster, the President and CEO, his brother and co-owner George Brewster Jr., and his father George Brewster Sr. have close to a hundred years of experience in the medical transport business.[1] Brewster employs approximately 1,800 people and operates approximately 300 vehicles daily, including ambulances, Day Care Vans, and Chair Cars.

Chair Cars are vehicles that transport a single wheelchair-using patient, typically to medical appointments. According to the undisputed testimony of Mark and of Brewster employees with expertise in its Chair Car program, Brewster staffs Chair Cars with only one driver, and Chair Car Drivers must communicate frequently with patients, dispatch, and medical

---

[1] Mark Brewster testified that his great-grandfather founded the original Brewster Ambulance company in 1906, which was run by his family and which Mark's father, George Brewster Sr., sold in 1997. Mark and his brother, George Brewster Jr., restarted the company in its current iteration in 2010. George Sr. came out of retirement in 2015 to help the company during an expansion phase and re-retired in 2023. All three were involved in the decisionmaking in this case. For clarity, the opinion refers to the three Brewsters by their first names.

facilities during day and night shifts. "[E]very [Chair Car] ride is required to have a medical necessity form completed by a licensed health care provider" attesting that the patient being transported has a medical reason why he or she cannot be transported by other means for Brewster to receive insurance reimbursement for the ride. The patients who qualify for Chair Car services typically come from skilled nursing facilities where they receive supervised care due to their medical issues. In Brewster's experience, as Mark testified at trial, such patients from time to time experience medical emergencies while in Chair Cars, including heart attacks, strokes, vomiting, and problems with oxygen tanks. Such emergencies require immediate responses from the driver of the Chair Car. All drivers, as a result, must have first responder training and be CPR certified, and are trained to call 911 in a medical emergency.

In addition, Brewster's Chair Car supervisor, William J. Sefton, testified about other patient incidents requiring immediate responses from the driver, including a patient who got out of the wheelchair while the van was moving and had to be told by the driver to sit back down, and a patient falling out of the wheelchair due to a broken seatbelt. Sefton also testified that Chair Car Drivers monitor patients visually via the rearview mirror. He further testified that, from his experience as a Chair Car Driver, it is helpful when drivers talk to patients because it

"puts them at ease" and helps "mak[e] sure that they're comfortable."

Chair Car Drivers also frequently communicate with dispatch in addition to talking to patients in the car. Dispatch assigns patients to Chair Car Drivers and notifies the drivers of the patients' names, locations, and destinations throughout the day. Drivers must also notify dispatch every time there is a status change, such as when they are arriving at a location, beginning transport, and experiencing a delay. The number one cause of distracted driving at Brewster is cell phone use.

Brewster uses a radio system for communications between drivers and dispatch, which is highly reliable and generally has no delays or downtime. Use of the radio system requires the driver to contact dispatch by picking up a small microphone which is clipped on the dashboard, depressing a button on the side of the mic, and speaking into it. Mark testified that Brewster used a radio-based communication system rather than a cell-phone-based communication system because the radio system, unlike cell phones or tablets, does not require the driver to remove their eyes from the road to find the correct buttons or dial a number on the cell phone. Mark's undisputed testimony stated that the number one cause of accidents involving Brewster vehicles is distracted driving. Drivers also must communicate with staff at the facilities where patients are picked up and dropped off.

**B.**

John Buccieri applied for a position as a Chair Car Driver on January 10, 2019. Buccieri was born deaf, and his primary language is American Sign Language ("ASL").[2] Brewster scheduled Buccieri for an interview with Joseph Hughes, a regional manager who had no experience personally driving Chair Cars.[3] Before the interview, Hughes had internal conversations with Brewster's Human Resources ("HR") Department about how Brewster might reasonably accommodate a deaf Chair Car Driver. On January 18, 2019, Hughes asked HR "what [Brewster] can offer as a reasonable accommodation for [Buccieri's] disability and this job," and Paul Mohnkern, Brewster's HR manager who also had no personal experience driving Chair Cars, responded that evening and identified relevant issues to discuss with Buccieri, including "how will he handle dealing with the general public, and how will

---

[2] At the time that Buccieri applied to Brewster, he had previously worked for about four years at Advocates Inc. as a residential counselor in a group home for deaf individuals. At Advocates, part of his job included driving group home residents to appointments, stores, and other locations, and Buccieri testified that two residents he transported used wheelchairs. Buccieri also testified he was able to communicate directly using sign language with all of the Advocates residents. Buccieri had also done delivery work for two years at Jerry's Marine Services, and had been a volunteer firefighter for almost six years in Florida.

[3] As regional manager for the Worcester region, Hughes managed day-to-day operations of approximately thirty ambulances and about ten Chair Cars.

he handle an emergency/ lift breaking/ less than great patient" and "[h]ow will he properly and timely communicate with [d]ispatch." Mohnkern noted that "[t]hose questions need to be asked . . . because the[se] [issues] will happen daily" and Brewster "need[s] to make sure [Buccieri], the patient, the vehicle, and the company are safe." Hughes responded by email to Mohnkern that he "would like to send [Buccieri] the job description and have him prepare some answers for the interview on how he would meet all the job requirements," which Mohnkern replied was "a great idea." Hughes emailed the job description to Buccieri on January 22, 2019, informing him of Brewster's concern that "[t]he biggest hurdle will be communicating effectively with our dispatch center and the clients," and adding that "[w]e are 100% radio dispatched." Hughes also asked Buccieri to "[p]lease take a look and think of ways we can help you achieve the requirements of the job." The job description listed as a "Qualification[] and Education Requirement[]" of the position that Chair Car Drivers "[m]ust be able to read, speak and write English." It listed "Roles and Responsibility" of the Chair Car Driver position, including:

> Preserve a secure environment for all clients transported in a Brewster Ambulance vehicle. Proper restraints will be used at all times.
> . . . .
> Communicate with Field Supervisor for any scanning . . . and unusual occurrences.

- 7 -

. . . .

Participate in assigned base duties [of providing patient Chair Car transportation services] to be performed in support of base operations. Adherer [sic] to base duties as well as policies and procedures of Brewster Ambulance.

. . . .

Cultivate a professional relationship while interfacing with shift crews, Field Supervisors, Customers and patients.

Provide safe and courteous transportation to any client transported by Brewster Ambulance Service.

. . . .

Use proper and professional radio etiquette at all times.

Hughes conducted the in-person interview with Buccieri on January 24, 2019, which Buccieri attended with an in-person ASL interpreter. The only accommodation that Buccieri requested from Brewster was to use Video Relay Services ("VRS") to communicate with dispatch. VRS is a federally funded service that "enables persons with hearing disabilities who use [ASL] to communicate with voice telephone users through video equipment, rather than through typed text." Consumer Guide: Video Relay Services, Fed. Commc'ns Comm'n (July 18, 2022), https://www.fcc.gov/consumers/guides/video-relay-services [https://perma.cc/W3AU-XGK7]. VRS connects Buccieri to an ASL interpreter via a video application on his personal cell phone, while the ASL interpreter is on a telephone call with the hearing party. See id. The interpreter then "relays the conversation back and forth between the parties," signing spoken comments from the hearing party to Buccieri over

the video link, and saying Buccieri's signed comments to the hearing party over the telephone call. Id. Buccieri demonstrated the VRS system to Hughes during the interview, and Hughes reported in an email to Mohnkern later that day that the VRS system allowed Brewster to call Buccieri or Buccieri to call Brewster.[4] Buccieri and Hughes discussed Brewster providing a phone holder for Buccieri's personal phone in the Chair Car to allow Buccieri to see when a call from dispatch is coming in, pull over, and answer that call and communicate with dispatch through VRS. Buccieri clarified in his testimony that the VRS system has had "WiFi issues and technical issues" and was "really not a professional process." Buccieri, however, did not propose VRS as a means to communicate with patients and presented no evidence that it would allow communication with patients.

In his email to Mohnkern after the interview had concluded, Hughes recommended that Buccieri be hired and that, in addition to the VRS and phone holder accommodation, Buccieri have an in-person ASL interpreter for orientation and his first day of training. On January 30, 2019, Mohnkern notified Mark, George Jr., and George Sr. by email about Buccieri's application, Hughes's recommendation, and Buccieri's articulated accommodation request

---

[4] Hughes also reported in that email that in the demonstration VRS worked "very well" and allowed "a normal conversation back and forth with almost no lag."

of VRS and a phone holder. Like Hughes, Mohnkern had never worked as a Chair Car Driver. Mark, by contrast, who had worked as a Chair Car Driver for four years, used his and his family's experience in considering whether and how Buccieri could be accommodated. Mark responded to Mohnkern's email on the same day, with George Sr. and George Jr. copied, and expressed his concerns that Buccieri "would [not] be able to communicate with staff or hear the radio when we call him for runs," concerns that Mark, consistent with that contemporaneous email, testified at trial he had "[b]ecause all of what [Brewster] do[es] in [the medical transportation] industry requires verbal communication . . . not only radio transmissions but staff at the facility [a patient was being transported to or from]." George Sr. responded to Mohnkern's email after Mark, stating that "it would be awesome to hire him if he can do the job," but expressing concerns about Buccieri's communication abilities beyond communication with dispatch, such as "how would he communicate with staff at facilities," "[h]ow would he know if a patient needed help in the back of the vehicle," and "[h]ow would he communicate with his patients."

Despite these concerns, reading the evidence most favorably to Buccieri, Brewster apparently extended a verbal offer of employment to Buccieri at some point after his January 24, 2019, interview. Brewster also arranged for Buccieri to join one of its

Chair Cars on trips picking up and dropping off patients on January 31, 2019.[5] While in the Chair Car during this ride-along, Buccieri did not have an ASL interpreter with him, and he never drove the Chair Car; Buccieri helped the wheelchair patients into and out of the car and helped secure their wheelchairs in the vehicle. The next day, on February 1, 2019, Hughes sent an email to Mohnkern reporting that Buccieri:

> rode yesterday with our [Chair Car] supervisor[6] for 3 calls. Our supervisor is concerned he will not be able to do the job and expresses concerns on his ability to communicate with the clients and staff at the facility. As much as I would like to hire him as he is very dedicated to this I also share the same concerns.

Given these concerns about Buccieri's ability to fulfill the essential communications functions of the Chair Car Driver role, Hughes asked in the same email to Mohnkern on February 1, 2019, whether Brewster could "offer him anything else in our organization."

That same day, Mohnkern contacted Matt Churchill, the supervisor of Brewster's Day Care Van services where there was an

---

[5] Hughes's undisputed testimony was that he and Buccieri had agreed during the interview to have Buccieri ride along with a Brewster Chair Car, although he could not remember whose idea it was to have Buccieri join a Chair Car ride.

[6] Hughes testified at trial he believed the supervisor in question was William J. Sefton, as Sefton was "the only supervisor" in the Chair Car division. Sefton testified, however, that he was not the driver who had Buccieri ride along with him.

opening for the different position of a Day Care Van Driver, via email to ask "would [Buccieri] be a candidate for Day Care, or is there too much communication with that as well."  Brewster's Day Care Vans are fifteen-passenger vans that transport multiple patients, who are generally less medically fragile than Chair Car patients, to and from appointments during the day.  On February 4, 2019, Churchill informed Mohnkern by email that "Day[] [C]are Vans require the same amount of communications [as Chair Cars] unfortunately."

On February 4, 2019, Mohnkern emailed Mark and shared Hughes's email with the concerns about Buccieri's communication abilities and Churchill's assessment that Day Care Vans required the same amount of communication.  Mark responded by email the same day and stated that "[a]s much as I would like to give him an opportunity, . . . [i]f he can't communicate with the patients I don't see how it would work."

Mohnkern consulted with the billing department manager to determine if that department had a suitable opening and was told there were no opportunities for individuals, such as Buccieri, who were inexperienced in billing.

In the meantime, Buccieri heard nothing further from Brewster after his January 31, 2019, ride-along.  On February 14, 2019, Jennifer Courville, a Career Resource Specialist who had been aiding Buccieri in his job search, reached out to Brewster

via email to inquire about the status of Buccieri's application. Later that day, Buccieri received a verbal rejection from Brewster, apparently with the promise that "he would be receiving a formal letter from the [HR] [D]epartment explaining the reason why he was not hire[d] for the [C]hair[] [Car] [D]river position." When that letter did not come within a week, Courville again emailed Brewster on Buccieri's behalf, asking on February 21, 2019, when Buccieri could expect the letter. Three days later, on February 24, 2019, Mohnkern responded, emailing Courville a formal rejection letter, which he asked her to forward to Buccieri. Buccieri later confirmed he had received the email. The email stated that Brewster had concerns that "someone would be successful without the ability to hear," given that the "three primary components" of the position were "Passenger Safety, Operations, and Customer Service." It also informed Buccieri of alternative positions that Brewster had considered once it had determined that the Chair Car Driver position "would not be a fit" and the reasons why Buccieri was not eligible for those positions.

The email had an attached document identifying the specific issues Brewster had with Buccieri's ability to perform the Chair Car Driver job. The attached document listed five questions and answers, addressed to Buccieri from the perspective of Brewster, that detailed "the contributing factors as to why Brewster Ambulance Service will not be extending a job offer to

- 13 -

you for the Chair Car Driver position." The first question asked "[w]ould a person sitting behind you, out of reach, be able to notify you they had an urgent medical concern?" The answer to Question 1 stated:

> No. Because you would not be able to hear a request for assistance, or hear an unusual sound like an audible grunt or respiratory noises, you would have to rely on visual monitoring of a passenger in the rearview mirror, or by turning around. This would cause a safety concern when driving as the mirror is designed for vehicle operation and not monitoring internal occupants. While the mirror could be used to look at a passenger when queued by them, it is not a sufficient means of continuous monitoring by itself. It could also delay a response to intervene with first aid until the situation was noticed visually.

Question 2 asked "[w]ould you be able to quickly identify a passenger who has unsecured themselves from the seat with the intention of moving about the chair car cabin or attempting to exit the vehicle, experiencing distress, or requesting assistance?" The answer to Question 2 stated:

> No. We felt that without hearing the belts become unbuckled, noise of movement in the chair and with securing devices, it would be possible for a passenger to become unsecured and interrupt vehicle operation before it was visually noted.

Question 3 asked "[w]ould the inability to communicate over the radio cause a delay or disruption in service?" The answer to Question 3 stated:

- 14 -

Yes. The dispatcher is responsible for dispatching emergencies to ambulances and non-emergent transports to chair cars and transport ambulances. They also use a computer system to enter dispatching data simultaneously in a fast-paced, high stress environment. They would need to stop or delay these processes to make a phone call on the VRS system. In order to make sure the information was transmitted correctly this would require additional time to confirm transmitted information to the VRS interpreter is relayed correctly.

Question 4 asked "[a]re their [sic] potential problems with the VRS system?" The answer to Question 4 stated:

Yes. A study from the National Consortium of Interpreter Education Centers identified that users of the VRS system report the skill level of interpreters was much higher than when VRS call centers were first established. Interviewees cited examples such as interpreters not being able to sign fluently, not being able to read fingerspelling or numbers, and not being able to recognize sign variations.
This could lead to delays in getting the right passenger to the right destination [if] incorrect information was transmitted.

Question 5 asked "[w]ould there be a means to overcome the requirement in the posted job description to speak English?" The answer to Question 5 stated:

With difficulty. Most of our customers speak English and those with some level of functional communication problems struggle to speak or speak clearly. They may not have any other means of communicating because of developmental or cognitive delays. In many cases, their low audible, difficult to understand speech, is the only means of communication. It would be difficult to speak

- 15 -

to this population who already struggle to communicate.

Mohnkern's email also invited further conversation, asking Buccieri's Career Resource Specialist to "[p]lease let me know if you have any questions."  Mohnkern also testified that Brewster was open to further discussions concerning accommodations based on the detailed explanation that Mohnkern's email provided. Buccieri admits he never responded to this invitation or raised any questions with Brewster.

## II.

Buccieri's ADA suit against Brewster was filed on November 14, 2022, in federal court.[7]  On February 7, 2025, over Brewster's objection to separating the liability and damages portions of the trial, the court entered an order that "the liability portion of the trial [will] start[] first, followed by the damages portion," and that "[a]t the close of the liability portion, the [c]ourt will hear the parties on whether to continue with the same jurors."

The jury trial began on February 10, 2025.  At the close of testimony on day three, Brewster's counsel made a Rule 50(a)

---

[7]  The court sua sponte dismissed Buccieri's claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, as untimely, and Buccieri voluntarily withdrew his time-barred claim under Mass. Gen. Laws ch. 151B.  Buccieri does not appeal the dismissal of his Section 504 claim.

- 16 -

motion for judgment as a matter of law, arguing that the evidence was insufficient on three different grounds.[8]  Counsel argued that:

(1)  There was insufficient evidence to find that Buccieri could perform the essential functions of the Chair Car Driver position:

> [T]he jury cannot find that he has presented evidence that with a reasonable accommodation he could have performed the essential functions of this job.

(2)  Brewster had shown that accommodating Buccieri would be an undue hardship:

> So [Buccieri's] own testimony, his own admission of a party opponent is that the technology he proposed was not reliable, and translate that into an emergency situation or a medically sensitive situation, such as Brewster, and I don't know how the jury could find that he could do this job based on the facts my client knew at this time.

(3)  There was insufficient evidence on the facts presented to permit a separate theory of liability for Brewster's alleged failure to engage in the interactive process:[9]

> [T]he interactive process ended with my client outlining the concerns and Mr. Buccieri never

---

[8]  At trial, Brewster's counsel and the district court referred to the Rule 50(a) motion as a "directed verdict" motion, which is "the term the [Federal Rules of Civil Procedure] used for a Rule 50(a) motion for 'judgment as a matter of law' prior to the 1991 amendment." Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 9 n.14 (1st Cir. 2021) (citing Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment).

[9]  Buccieri's complaint had not included failure to engage in an interactive process as a potential basis for liability. Buccieri apparently first raised that theory at the February 5, 2025, pre-trial conference.

- 17 -

responding. So he ended the interactive process on this.

Brewster's counsel later expanded:

> [T]here has to be a failure on my client's part in the interactive process . . . for that theory to be cognizable. . . . I'm struggling with where the failure is because [Buccieri] presents the VRS. My client, you see from the emails very clearly, considers the VRS, considers his . . . operation in the field, considers other jobs for him, . . . goes even the extra step in saying, hey, look, he hasn't asked for it, but can we bring in a translator for orientation.

The court denied the Rule 50(a) motion on all three grounds. At the charge conference the next day, Brewster also objected to the wording of Question 6 of the jury verdict form concerning the interactive process, which the court overruled.[10]

---

[10] Question 6, which was not in the proposed jury verdict form submitted by Buccieri or Brewster, asked the jury whether Buccieri proved that "had a good faith interactive process occurred, Mr. Buccieri and Brewster Ambulance could have found reasonable accommodation(s) that would have enabled Mr. Buccieri to perform the job's essential functions." Brewster's counsel argued that the phrase "had a good faith interactive process occurred" "suggests that a good faith interactive process did not occur" but "[the jurors are] not asked that question," and suggested alternate wording to avoid "assuming that there's been a lack of an interactive process, which I think is very much in dispute." The court overruled the objection, and Brewster's counsel renewed the objection before the jury retired. As Brewster does not develop a verdict form impropriety argument on appeal, we do not address this issue. See Xirum v. Bondi, 141 F.4th 345, 355 (1st Cir. 2025) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

The jury found as follows. Question 1, which the verdict form labeled as a "COMMON ELEMENT" to both failure to hire and failure to engage in an interactive process, asked the jury whether:

> the Plaintiff, Mr. John Buccieri, prove[d] by a preponderance of the evidence that he could have performed the essential functions of this position on or about February 24, 2019, [the date of Brewster's written explanation of its decision not to hire Buccieri,] if Brewster Ambulance had made reasonable accommodations for Mr. Buccieri's disability?

The jury responded "Yes" to Question 1.[11]

The verdict form labeled Questions 2-4 as concerning the "FAILURE TO HIRE" basis for liability. Question 2 asked the jury whether:

> the Plaintiff, Mr. John Buccieri, prove[d] by a preponderance of the evidence that he was a qualified individual under the Americans with Disabilities Act on or about February 24, 2019?

The jury answered yes. Question 3 asked the jury whether:

> the Plaintiff, Mr. John Buccieri, prove[d] by a preponderance of the evidence that his disability was a motivating factor in Brewster

---

[11] During deliberations, the jury asked a question regarding "Question 1 and its reference to reasonable accommodation," and asked the court whether it "[s]hould . . . be considering the phone holder and VRS as the only reasonable accommodations or just reasonable accommodations in general?" The court responded, "I'm going to go back to the jury instruction," repeating that "[t]he burden is on the employee or the potential employee to offer what the accommodation is intended to be. You cannot speculate what was not in the evidence. You can only take the evidence that you heard that was believable and the instructions."

- 19 -

Ambulance's decision to take an adverse employment action against him?

The jury answered yes. Question 4 asked the jury whether:

> the Defendant, Brewster Ambulance, prove[d] by a preponderance of the evidence that providing Mr. Buccieri with the requested accommodation(s) would have been an undue hardship to Brewster Ambulance and/or posed a direct threat to Mr. Buccieri or others?

The jury answered yes.

The verdict form labeled Questions 5 and 6 as concerning the "FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS" basis for liability. Question 5 asked the jury whether:

> the Plaintiff, Mr. John Buccieri, prove[d] by a preponderance of the evidence that he made a request for an accommodation that was sufficiently direct and specific so as to put Brewster Ambulance on notice of the need for that accommodation?

The jury answered yes. Question 6 asked the jury whether:

> the Plaintiff, Mr. John Buccieri, prove[d] by a preponderance of the evidence that, had a good faith interactive process occurred, Mr. Buccieri and Brewster Ambulance could have found reasonable accommodation(s) that would have enabled Mr. Buccieri to perform the job's essential functions?

The jury answered yes. In light of these verdict form answers, the court and the parties understood the jury as returning a split verdict, finding for Brewster on Buccieri's failure-to-hire theory but finding for Buccieri on his interactive-process theory.

At a status conference on April 29, 2025, the court told the parties that it was taking the jury trial for the damages phase off the schedule and directed the parties to present supplemental briefing "specific[ally]" on the issue of "the level of interaction -- interactive process, the participation by both parties." The court had not entered final judgment as to liability, and it stated that it had "serious doubts that there was sufficient evidence to support the interactive process verdict." The court stated that "[t]he First Circuit is very clear that the interactive process is a two-way street," citing EEOC v. Kohl's Department Stores, Inc., 774 F.3d 127 (1st Cir. 2014), which held that Kohl's was not liable under the ADA where the employee had failed to engage in an interactive process, see id. at 132-34. Brewster's counsel stated that the defendant "anticipated filing a post[-trial] motion," but that the Federal Rules of Civil Procedure were "clear we didn't need to do it until after a judgment had issued." Counsel offered "to get [the motion] in by the end of the week in a [Rule 50(b) motion], if that would be easier." The court responded that both parties should "brief this specific issue" by May 20, 2025.

In Brewster's supplemental briefing submitted on May 20, 2025, Brewster argued that the court should "direct entry for

- 21 -

Brewster as a matter of law" under "FRCP 50(b)(3),"[12] "given the lack of evidence that Brewster failed to engage in the interactive process in good faith":

> The evidence . . . makes it clear that Brewster was more than willing to support the one accommodation . . . that [p]laintiff requested. . . . The undisputed testimony is that Brewster was open to further discussions, but [p]laintiff ceased the dialogue.
> . . . Brewster determined that the accommodation would not be fully effective. Brewster looked for other accommodations, but did not fail to consider other accommodations or refuse to communicate with [p]laintiff.

Brewster's brief also argued:

> The Court should also consider whether there was any evidence that a reasonable accommodation would have been found to enable [p]laintiff to perform the essential functions of the job. The jury's second question [to the court during deliberations] ("Should we be considering the phone holder and VRS as the only reasonable accommodations or just reasonable accommodations in general?") suggest[s] the jury was speculating on this. There is no evidence in the record as to an accommodation identified or requested by [p]laintiff that would have permitted him to communicate as needed.

The brief also stated that "Brewster reserves its right to file for post-judgment relief on a broader range of issues if necessary"

---

[12] The Federal Rules of Civil Procedure provide that Rule 50(b) motions must be filed "[n]o later than 28 days after the entry of judgment." Fed. R. Civ. P. 50(b). As judgment had not yet entered at the time of defendant's post-trial briefing, the Rule 50(b) motion was timely.

- 22 -

as the post-trial brief was only responsive to "[t]he [c]ourt['s] . . . requested briefing on a narrow issue."

In Buccieri's supplemental briefing submitted on May 20, 2025, he argued that "the verdict [was] impervious to a renewed motion for judgment as a matter of law" because there was "a substantial and compelling evidentiary basis for each of th[e] [jury's interactive process] findings." Buccieri argued that the evidence established there had been a "[p]ost-[i]nterview [b]reakdown . . . in the interactive process attributable to Brewster":

> Despite Mr. Hughes' positive assessment [after the initial interview], the interactive process deteriorated after Brewster's ownership and senior human resources became more involved without direct, meaningful dialogue with Mr. Buccieri about their emerging internal concerns.
> . . . [Brewster's] alleged and vague ride-along concerns were never discussed with Mr. Buccieri, nor was he given any opportunity to address them or suggest alternative approaches. . . . [This] represent[ed] a clear breakdown in the "meaningful dialogue" required.

Buccieri also argued that "the jury heard evidence" that Brewster engaged in "empty gestures on the part of the employer [that do] not satisfy the good faith standard" (second quoting Kohl's Dep't Stores, 774 F.3d at 132).

On July 28, 2025, the district court granted defendant's motion and entered judgment in favor of Brewster on all counts.

- 23 -

Buccieri, 792 F. Supp. 3d at 283. The court stated that "Brewster cannot be liable . . . when it concluded it could not provide Mr. Buccieri a reasonable accommodation" and that "[t]here was ample evidence at trial that established Brewster's undue hardship," so "the verdict on [failure to engage in the interactive process] should be set aside because 'the jury failed to reach the only result permitted by the evidence.'" Id. at 282 (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006)).

Buccieri's appeal followed.

### III.

This court "review[s] Rule 50 challenges to the sufficiency of evidence presented at trial de novo, affirming entry of judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving party]." Intercity Maint. Co. v. Loc. 254, Serv. Emps. Int'l Union, 241 F.3d 82, 86 (1st Cir. 2001) (second alteration in original) (internal quotation marks and citation omitted).

Under de novo review, where, as here, arguments are properly made in Rule 50(a) and Rule 50(b) motions and properly preserved, this court "can affirm on any independent basis that appears in the record." McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals, 140 F.3d 288, 298 n.3 (1st Cir. 1998) (affirming denial of Rule 50(b) JMOL motion); see also

Quiles-Quiles, 439 F.3d at 5-8 (considering defendant's arguments that plaintiff had produced insufficient evidence to establish three elements of his disability harassment claim, only one of which was the basis of the district court's grant of JMOL on that claim); cf. Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 407 (2006) (when party "fail[s] to renew its preverdict [Rule 50(a)] motion as specified in Rule 50(b), there [i]s no basis for review of [party]'s sufficiency of the evidence challenge in the Court of Appeals").

We affirm the district court's order granting JMOL to Brewster. On the evidence before it, no reasonable jury could conclude that there was a reasonable accommodation that would have enabled Buccieri to perform the essential functions of the Chair Car Driver or Day Care Van Driver positions without undue hardship to Brewster.

It has long been the law that "an employee's request for accommodation sometimes creates 'a duty on the part of the employer to engage in an interactive process,'" which "involves an informal dialogue between the employee and the employer" "for the purpose of discussing alternative reasonable accommodations." Kohl's Dep't Stores, 774 F.3d at 132 (emphasis added) (footnote omitted) (quoting Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008)). An employer cannot be held liable on an interactive process theory where "the record forecloses a finding that the plaintiff could

perform the duties of the job[] with . . . reasonable accommodation." Kvorjak v. Maine, 259 F.3d 48, 53 (1st Cir. 2001); see also Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 133 (1st Cir. 2017) ("The omission of an interactive process is of no moment if the record forecloses a finding that the employee could do the essential duties of the job, with or without reasonable accommodation, -- which . . . is the case here." (internal quotation marks and alteration omitted) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 456 (1st Cir. 2016))).

No reasonable jury could conclude there was a reasonable accommodation that would have allowed Buccieri to perform the essential communications functions of the Chair Car Driver position or the Day Care Van Driver position without undue hardship to Brewster. As the jury did find, Buccieri's requested accommodation of VRS and a phone holder would be an undue hardship on Brewster. We reject Buccieri's argument to us that, nonetheless, a jury could reasonably find that "at least one of th[e] other accommodations" "presented at trial -- including reassignment [to the Day Care Van Driver position], [text-based and] tablet-based dispatch, or structured visual-monitoring protocols" "could have enabled Mr. Buccieri to perform the essential functions of" either the Chair Car or Day Care Van Driver positions without undue hardship to Brewster. We treat Buccieri as having presented a challenge to both driver positions despite

- 26 -

language in his brief failing to specify which position he was addressing and referring only to "the job." The undisputed testimony at trial established that Chair Car Drivers are required to communicate with dispatch, patients, and facilities staff, and no accommodation would permit Buccieri to do so without imposing an undue hardship on Brewster. The undisputed evidence was that the same was true for the Day Care Van Driver job.

Buccieri presented no evidence to rebut that his proposed tablet-based or any cell-phone-based accommodation for communicating with dispatch, even if it was available at the relevant time, would pose safety risks to all concerned of the driver's eyes being taken off the road, risks the ADA did not require Brewster to undertake. Brewster's radio system for dispatch communications has safety advantages over Buccieri's alternative accommodation of tablet-based communications, because the radio system allows drivers to connect instantly to dispatch with the press of one button on the radio and without taking their eyes off the road. Brewster established that distracted driving is the number one cause of accidents involving Brewster vehicles and that cell phone use is the number one cause of distracted driving.

As for the essential functions of communicating with patients and ensuring their safety, Buccieri argues that the jury had sufficient evidence to find that "a structured mirror-

monitoring protocol" would allow him sufficient visual monitoring to supervise the patients for medical emergencies. There are multiple problems with Buccieri's argument, as "[t]he law does not require an employer to accommodate a disability by foregoing an essential function of the position." Kvorjak, 259 F.3d at 57 (internal quotation marks and citation omitted). The alternative "visual-monitoring protocol[]" he proposes to us did not meet Brewster's service and safety standards. Beyond that, Buccieri produced no evidence that, for example, mirror-based monitoring could ensure patient safety in darker conditions. As the district court recognized, Buccieri presented "no evidence, none, that he had that ability" "to speak to the patients."

For the same reasons, there is also no evidence to support a finding that there were reasonable accommodations that would have allowed Buccieri to perform the essential communications functions of the Day Care Van Driver position, the alternative position that Brewster considered as a potential accommodation for Buccieri, without undue hardship. Brewster's Day Care Van manager's undisputed assessment was that the role of Day Care Van Driver still "require[d] the same amount of communications" as the Chair Car Driver role, but with even more patients in the Day Care Van vehicles.

The district court's order, mistakenly, referred to rationales based on supposed verdict inconsistency and the

impropriety of verdict form Question 6, which were not raised by Brewster as grounds for JMOL "in either its Rule 50(a) or Rule 50(b) motion . . . [thus making] the district court's sua sponte tackling of th[ese] issue[s] error." Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 8 (1st Cir. 2021) (emphasis omitted) (overturning the district court's grant of JMOL to defendant on an issue argued in defendant's Rule 59(a) motion but not in defendant's Rule 50(a) or Rule 50(b) motion). "[A]llowing a judge to sua sponte raise a new issue post-verdict, and proceed to overturn a jury verdict on that basis[,] [would] contravene[] the dictates of Rule 50(b)," id. at 9 (quoting Robles-Vazquez v. Tirado Garcia, 110 F.3d 204, 207 (1st Cir. 1997)), as Rule 50(b) forbids a district court from granting a defendant's Rule 50(b) motion based on a new ground not contained in a Rule 50(a) motion, id. at 8-9. Notwithstanding this mistake, we can affirm on the insufficiency-of-the-evidence basis already explained, given that Brewster did raise that issue in its Rule 50(a) and Rule 50(b) motions.

## IV.

The order of the district court is **affirmed**.